# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-01056-COA

JERALDINE CAMPBELL A/K/A TRICE A/K/A        APPELLANT
JERALDINE LATRICE CAMPBELL

v.

STATE OF MISSISSIPPI                                      APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 09/22/2022 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | NOXUBEE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: CASEY BONNER FARMER |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/27/2024 |
| MOTION FOR REHEARING FILED: | |

### BEFORE CARLTON, P.J., McDONALD AND EMFINGER, JJ.

### EMFINGER, J., FOR THE COURT:

¶1. A Noxubee County grand jury returned a two-count indictment against Jeraldine Campbell for the armed robbery and attempted murder of Bobby Hibbler. Campbell was tried and convicted of attempted murder, but she was acquitted on the armed robbery charge. On appeal, Campbell argues that the trial court erred in denying her motion for a new trial.

## FACTS AND PROCEDURAL HISTORY

¶2. The facts are disputed as to the events that began on the evening of July 13, 2020, and spilled over into the early morning hours of July 14. Both Campbell and Hibbler testified that they were at a gathering on Cedar Creek Road on the evening of July 13 where people

were drinking, gambling, and "hanging out." Much of the remainder of their testimony, however, is in conflict.

¶3. Hibbler testified that after work on July 13, 2020, he went over to his cousin's house on Cedar Creek Road where a group of people were gathering. According to Hibbler, he sat on the porch and drank a cold beer while other people were gambling and shooting dice inside the house. Hibbler stated that Campbell was also at the house, but he did not have any direct conversations with her. Hibbler testified that, at one point during the evening, Campbell was standing in his general vicinity and could have overheard Hibbler giving his phone number to another person at the gathering. Hibbler testified that one of his friends, Houdini, was gambling and won a significant amount of money from Campbell. According to Hibbler, Houdini came out onto the porch to count his money and asked Hibbler to hold some of it for him. While the two men were sorting Houdini's winnings, Hibbler testified that Campbell asked Houdini to lend her $500. Hibbler stated that Houdini did not lend her the full amount, but did give her $200. According to Hibbler, Campbell saw Houdini give him "a bunch of hundred dollar bills" for safekeeping. However, Hibbler testified that Campbell was not present later when Houdini came back and got his money from Hibbler as Houdini was leaving the house. Hibbler testified that when he left the house around 11:00 p.m., Campbell was still there.

¶4. Hibbler told the jury that once he got home, he took a shower and went to bed. He stated that around 3:00 a.m., his cell phone began to ring. He did not recognize the phone number, so he did not answer the call. Although his cell phone rang multiple times

2

thereafter, Hibbler testified, he did not answer his phone until around 5:30 a.m. as he was waking up to get ready for work. Hibbler testified that when he answered his phone, it was Campbell asking him to come help her because she was having car trouble. Campbell said that her car was running hot and told Hibbler that his cousin Princess was stranded with her just down the road. According to Hibbler, he "slipped on some short pants, house shoes, and a t-shirt, and went down there." Hibbler said that he pulled his car in front of Campbell's car, and when he looked back, a car was approaching behind them. At that point, Hibbler told Campbell to "go on down the road and get out of the road" if she wanted him to check out her car. Hibbler and Campbell proceeded down the road and pulled off to the side. At trial, Hibbler gave the following account of what happened next:

> When she pulled up behind me, I got out of the car, and I noticed that – I said, your car running hot or whatever? She said you got any money[?] I said no, I ain't got no money. I just got clothes on, short pants and a T-shirt and house shoes. I ain't got no money. And she kept asking me for money. I said I ain't got no money. I looked around the car. I know the car wasn't hot because I'm a mechanic. I know wasn't nothing wrong with the car. . . . I looked and said where Princess at, my cousin? . . . I looked in her car, and I looked, I said where Princess at? Where my cousin Princess at? She kept saying you got any money? I said, no, I ain't got no money. . . . When I turned around, [I] said, girl, I got to go to work. I'm going to be late for work. It's getting close to 6:00. I got to be at work at 6:00. When I turned around[,] she shot me. . . . I was shot right behind here (indicating). Right behind my neck right here, went through my jaw, broke my jaw bone. And they got the bullet out straight up here. Messed this eye up. . . . When she shot me, I fell. And when I fell[,] I could feel her going in my pockets. . . . When she shot me[,] my clothes was on me. Okay. When she left and I was on the ground trying to get myself up, them pants didn't have no – they just loose pair of pants. They slid off me.

Hibbler managed to get himself back in his car and drove to two different residences seeking help before an ambulance arrived to render aid.

¶5.     In her defense, Campbell testified that she arrived at the gathering on Cedar Creek Road between 8:00 and 9:00 p.m. on July 13, 2020.  According to Campbell, she was hanging out with Princess and some other people that night, but she was not drinking or gambling.  Campbell testified that she did not know Hibbler well, but she had seen him around town before that evening.  Campbell testified that Hibbler approached her that night to discuss her interest in a piece of property that he was selling.  Campbell stated:

> He had heard that I was, you know, I had good money, whatever, and I was in a wreck.  I was fixing to come into more money.  And he was like he had property – well, basically he was saying what did I want to do, you know, like, once I got the money or whatever.  I was like I was thinking about investing, you know what I'm saying.  That's the best way to go.  Well, I got land, you know what I'm saying, I'm looking to sell or whatever.  I was like okay.  He was like take my number.  I put his number in my phone.  He went back to doing what he was doing.

According to Campbell, she noticed that Hibbler was drinking and using drugs that night. Campbell said that she left the house on Cedar Creek Road around 3:30 a.m. on July 14. Before leaving the house, Campbell called Hibbler to let him know that she was leaving the house to drop someone off but was coming back and wanted to "check out the spot he was talking about."  Campbell testified that Hibbler was still at the Cedar Creek Road house when she returned.  According to Campbell, Hibbler stated that he "had to go do something first with his girlfriend or something," but he would be back later to take her out to the land that they had discussed earlier.  Campbell stated that Hibbler never returned.  Campbell testified that she called Hibbler again around 5:00 a.m., and he said, "[Y]eah, yeah, yeah, yeah, come down past the airport.  I'll be waiting.  You'll see my car . . . . It's on the side of the road . . . ." Campbell testified that when she arrived at the spot that Hibbler directed her, he asked

4

her to "follow him to the spot down there.  That's where we went."  At trial, Campbell gave

the following account of what happened next:

> He pulled in.  I pulled in behind him.  He got out, and then I got out.  I asked
> him, I said, is this the land you [are] talking about?  He was like yeah. . . .  So,
> you know, I'm walking, checking out the land or whatever.  And I get ready
> to turn around and he done dropped his clothes. . . . he pulled his pants down
> like he – basically like you don't have to pay for it; I'll give it to you.  You
> know, basically that's what he's saying. . . .  I thought he was fixing to, you
> know, try to rape me basically. . . .  When he dropped his clothes he was
> walking towards me.  That's when I turned.  When I turned to go back to my
> vehicle he grabbed my arm. . . .  After he grabbed my arm I jerked away from
> him, and I happen[ed] to look over in his vehicle, and that's when I seen the
> gun on his seat.  I just picked it up.  When I picked it up, [it] went off. . . .  He
> was like you shot me, you shot me.  Just like that.  So I stumbled towards my
> car and got in my car and left.

Campbell admitted that she did not contact the authorities after the incident.  Campbell told

the jury that she did not contact law enforcement because she was raped at a young age by

a bailiff from the sheriff's department, and nothing was done about it.  According to

Campbell, she went home and went to bed after the shooting.  When Campbell was arrested

later that morning, she told investigators that she had not seen Hibbler after leaving the Cedar

Creek Road residence and knew nothing about the shooting.  Approximately two weeks later,

however, she changed her story and admitted that she had accidentally shot Hibbler on the

morning of July 14, 2020.  The gun used to shoot Hibbler was ultimately recovered from the

floorboard of Campbell's vehicle.[1]  Campbell was convicted for the attempted murder of

Hibbler on September 21, 2022.  On September 23, 2022, Campbell filed a motion for

judgment notwithstanding the verdict of the jury.  An "Order Denying Defendant's Motion

---

[1] While Campbell told the jury that she got the gun out of Hibbler's car, Hibbler
testified that he did not have a gun in his car.

for Judgment Notwithstanding the Verdict, or the Alternative for a New Trial" was filed on

October 3, 2022.

## STANDARD OF REVIEW

¶6.     In *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017), the Mississippi Supreme

Court held:

> Our role as [an] appellate court is to review the trial court's decision to grant
> or deny a new trial for an abuse of discretion. *See Amiker* [*v. Drugs For Less
> Inc.*], 796 So. 2d [942,] 948 [(Miss. 2000)] (citing *Dorr v. Watson*, 28 Miss.
> 383, 395 (1854) ("The granting a new trial rests in a great measure upon the
> sound discretion of the court below, to be exercised under all the
> circumstances of the case with reference to settled legal rules as well as the
> justice of the particular case. If a new trial be refused, a strong case must be
> shown to authorize the appellate court to say that it was error; and so, if it be
> granted, it must be manifest that it was improperly granted.")). In carrying out
> this task, we weigh the evidence in the light most favorable to the verdict,
> "only disturb[ing] a verdict when it is so contrary to the overwhelming weight
> of the evidence that to allow it to stand would sanction an unconscionable
> injustice." *Lindsey v. State*, 212 So. 3d 44, 45 (Miss. 2017).

## ANALYSIS

¶7.     Campbell argues only one issue on appeal. Campbell alleges that her conviction is

against the overwhelming weight of the evidence. Specifically, Campbell contends that

Hibbler's testimony was "materially contradicted by Campbell's testimony and the State's

evidence itself." She alleges that the evidence supported her testimony that Hibbler was

attempting to assault her on the morning of July 14, 2020, because Hibbler's shorts were

found on the ground at the scene of the shooting. Campbell does not give any other

examples as to how Hibbler's testimony was contradicted by the State's evidence.

¶8.     As set forth above, both Hibbler and Campbell testified at trial and gave their versions

6

of what happened on the evening of July 13 and the morning of July 14. As to why Hibbler's shorts were found on the ground at the scene of the shooting, Hibbler testified that the shorts he was wearing that morning were loose-fitting but were on his body at the time that Campbell shot him. He testified that after he was shot, Campbell started going through his pockets searching for money. Hibbler stated, "When she shot me my clothes was on me. Okay. When she left and I was on the ground trying to get myself up, . . . They just [a] loose pair of pants. They slid off me." Based on Hibbler's testimony, as a result of Campbell searching through his pockets and the fact that his pants were already loose, the jury could well have found that his shorts came off during his struggle to get into the car after he was shot in the head.

¶9.     Campbell's version of why the shorts were on the ground was substantially different from Hibbler's version. Campbell testified that she was walking around and checking out the land Hibbler allegedly owned, and when she turned around, "[Hibbler] done dropped his clothes. . . . [H]e pulled his pants down. . . . When he dropped his clothes[,] he was walking towards me." However, as noted above, Campbell first told law enforcement that she had no contact with Hibbler after she left the Cedar Creek Road residence and knew nothing about the shooting. Later, she changed her story and said that she accidentally shot Hibbler in an effort to protect herself against Hibbler's advances.

¶10.    As noted above and as directed by the trial court in the instructions to the jury, it was the jury's responsibility to resolve conflicts in the evidence, if possible. Similarly, in considering a challenge to the weight of the evidence, in *Goode v. State*, 374 So. 3d 592,

7

606-07 (¶¶35-37) (Miss. Ct. App. 2023), this Court reasoned:

> A challenge to the weight of the evidence "is separate and distinct from a challenge to the legal sufficiency of the evidence, in that it seeks a new trial." *Holland* [*v. State*], 290 So. 3d [754,] 761 (¶24) [(Miss. Ct. App. 2020)]. When reviewing a weight-of-the-evidence challenge, "[o]ur role as [an] appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Eaton v. State*, 359 So. 3d 1081, 1086-87 (¶22) (Miss. 2023) (quoting *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017). In so doing, we bear in mind that "[w]hen evidence or testimony conflicts, the jury is the sole judge of the weight and worth of evidence and witness credibility." *Wayne v. State*, 337 So. 3d 704, 715 (¶39) (Miss. Ct. App. 2022) (quoting *Williams* [*v. State*], 285 So. 3d [156,] 160 (¶17) [(Miss. 2019)]).
>
> Here, three eyewitnesses saw Goode shoot Devine in a deliberate manner. **The three eyewitnesses' testimonies and Goode's testimony presented a conflict in the evidence which was a matter for the jury to resolve. It was in the sole province of the jury to believe Goode's version of the events surrounding the shooting and murder of Devine or to believe the testimonies of the State's witnesses and other evidence presented. Again, "[w]hen evidence or testimony conflicts, the jury is the sole judge of the weight and worth of evidence and witness credibility."** *Wayne*, 337 So. 3d at 715 (¶39). The Mississippi Supreme Court has consistently held that "neither this Court nor the Court of Appeals sits as thirteenth juror. We do not make independent resolutions of conflicting evidence. Nor do we reweigh the evidence or make witness-credibility determinations. . . . [W]hen the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony." *Little*, 233 So. 3d at 292 (¶19) (citations omitted).

In addition, the trial court instructed the jury as follows:

> It is your duty to determine the facts and to determine them from the evidence produced in open Court. . . . As sole judges of the facts in this case, you are to determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness in this case. . . . You are also permitted to draw such reasonable inferences from the evidence as seem justified in the light of your own experience.

8

We presume the jury did exactly what the trial court instructed them to do. They determined the facts of the case by weighing the evidence and judging the credibility of the witnesses. Substantial evidence supported the jury's factual determinations. We find that the jury's resolution of the conflicting evidence in this case does not constitute an "unconscionable injustice," and the jury's verdict was not against the overwhelming weight of the evidence. Accordingly, we find no error on this issue.

(Emphasis added).

¶11. In the case at hand, the jurors were instructed as follows:

It is your duty as jurors to follow the law which I will state to you. On the other hand, it is your exclusive province to determine the facts in this case and to consider and weigh the evidence for that purpose. . . . You are the sole judges of the facts in this case. Your exclusive province is to determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness in this case. You are required and expected to use your good common sense and sound honest judgment in considering and weighing the testimony of each witness who has testified in this case.

The jurors heard the testimony of Campbell, Hibbler, and all the other witnesses. After considering all the testimony and weighing all the evidence, the jury resolved the conflicts in the evidence and found Campbell guilty of attempted murder. We find that the trial court's decision to allow the jury's verdict to stand does not constitute an unconscionable injustice.

**CONCLUSION**

¶12. After reviewing the record, we find that the trial court did not err by denying Campbell's motion for a new trial. Further, the jury's verdict was supported by substantial evidence and was not against the overwhelming weight of the evidence.

¶13. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE,**

9

**WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR.**